Kenneth Wade PERRY, Movant,

v.

COMMONWEALTH of Kentucky, ex rel.
Sheryl KESSINGER, Respondent.

Supreme Court of Kentucky.

June 15, 1983.

Alan N. Leibson, Louisville, for movant.

Irvin G. Maze, Louisville, for respondent.

MARLIN M. VOLZ, Special Justice.

Appellate review of this paternity action was prompted by a denial by the Jefferson District Court of a motion by the Commonwealth for an order under CR 35.01 to require the defendant, Kenneth Wade Perry, to submit to the Human Leukocyte Antigen (HLA) blood test and by a denial by that Court of a motion by the Commonwealth for a mistrial based upon a statement by Mr. Perry that even on his own he had taken a lie detector test. In denying the motion for the blood test, the Jefferson District Court had held that CR 35.01 was subordinate to KRS 406.081, being part of a special statutory proceeding within the meaning of CR 1(2)[1], and therefore was inapplicable. On appeal, the Jefferson Circuit Court reversed the judgment of the Jefferson District Court and granted a new trial, holding that CR 35.01 and KRS 406.-081 are not incompatible; that, if the statute alone is found to be applicable, it is unconstitutional as violating the equal protection clause of the 14th Amendment of the U.S. Constitution since only the alleged father could request a blood test and the mother could not; and that the reference by Mr. Perry that he had taken a lie detector test required the granting of a mistrial. The Court of Appeals of Kentucky granted discretionary review and affirmed the decision of the Jefferson Circuit Court in part, and reversed in part, affirming the granting of a new trial to permit the Commonwealth to move under CR 35.01 for an order for medical tests and to exclude any testimony referring to the taking by Mr. Perry of a polygraph test, and reversing the determination as to the unconstitutionality of KRS 406.081, finding that its constitutionality was saved by CR 35.01. We affirm the result reached by the Court of Appeals, and in doing so, specifically hold that CR 35.01 and KRS 406.081 are not inconsistent, that KRS 406.081 is constitutional, and that a new trial should be granted as mandated by the Court of Appeals.

In 1960, the Commissioners on Uniform State Laws submitted to the States for adoption a proposed Uniform Act on Paternity, accompanied by a Prefatory Note of the Commissioners explaining their purpose in part as follows:

> This Uniform Act on Paternity was originally drafted as a revision of the Uniform Illegitimacy Act, but experience with it at two annual conferences demonstrated that on some of the collateral matters included there were apparently irreconcilable points of view. Therefore the drafting committee discarded the pattern. As a result there is presented here a comparatively brief act confined to setting up the suggested civil action, wherever possible utilizing existing law.... It is hoped that this act will furnish an acceptable modernized procedure for handling this troublesome social problem....

Two of three basic tenets sought to be achieved by the Commissioners on Uniform State Laws have been fully accepted by this Court or its predecessor. In *Pendleton v. Commonwealth ex rel. Rawlins,* Ky., 349 S.W.2d 832 (1961), it was held that a paternity proceeding was a civil action and in *Sweat v. Turner,* Ky., 547 S.W.2d 435 (1977), this Court observed that

> The purpose of the Uniform Paternity Act was designed to give the mother a remedy to compel the putative father to contribute to the support of his illegitimate child.

---

**1.** CR 1(2) provides in part: "These Rules govern procedure and practice in all actions of a civil nature of this court of justice except for special statutory proceedings, in which the procedural requirements of the statute shall prevail over any inconsistent procedures set forth in the rules ..."

In doing so, the Act provided "a modernized procedure for handling this troublesome social problem" since the common law had not recognized this precise remedy.

This appeal requires this Court to consider and apply the third basic premise announced by the Commissioners on Uniform State Laws that "wherever possible . . . existing law" will be utilized. Such law in a civil case, as already recognized by the Kentucky Court of Appeals in *White v. Commonwealth ex rel. Feck,* Ky., 299 S.W.2d 618 (1957), includes the Kentucky Rules of Civil Procedure, and thus CR 35.01. In 1964 when the General Assembly adopted the Uniform Act on Paternity, such Rule read in part:

> In an action in which the mental or physical condition of a party is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician.

Effective October 1, 1971, this Rule was amended to conform to the 1970 amendment of Federal Rule of Civil Procedure 35(a) so as to continue the identical wording of the State and Federal rules. The principal changes made by the amendment were to identify specifically "the blood group" as a physical condition and to permit the examination of a person in the custody or under the legal control of a party. Since CR 35.01 originally, and as amended, was adopted verbatim from FRCP 35(a), federal court decisions interpreting the latter rule may be accepted as persuasive authority.

■ The defendant in a paternity proceeding is a party for purposes of CR 35.01. Thus, it was clear prior to the adoption by the General Assembly in 1964 of the Uniform Act on Paternity that, upon motion by the plaintiff and a showing of good cause, such defendant could be subjected to an examination by a physician as to any mental or physical condition in controversy. And long before 1964 it had been held by the United States Court of Appeals for the

District of Columbia in *Beach v. Beach,* 114 F.2d 479, 131 ALR 804 (D.C.1940), that in an action to determine paternity such examination could include blood tests since "the characteristics of one's blood . . . are part of one's physical condition." The Court in *Beach* also concluded that FRCP 35(a) "relates exclusively to the obtaining of evidence, and is therefore procedural." The Advisory Committee's notes to the 1970 revision of the Federal Rules of Civil Procedure indicate an intent to codify, and not to change, the holding in *Beach;* for that decision is cited as authority for the recommended addition of the words "(including the blood group)" in FRCP 35(a), which words, as previously stated, by virtue of the 1971 amendment became part of CR 35.01.

Thus, existing Kentucky law as evidenced by CR 35.01 in 1964 provided a procedure to obtain a blood test of the defendant (alleged father). The converse was true only if the mother and child were named parties to the action or were considered to be such. The language adopted in KRS 406.021(1) arguably allows for situations where they might not be parties. The proposed draft of the Uniform Act on Paternity of the Commissioners on Uniform State Laws read:

> Paternity may be determined upon the [petition] [complaint] of the mother, child, or the public authority chargeable by law with the support of the child.

While substantially using such language in the first sentence of KRS 406.021(1)[2], the General Assembly added:

> Such action shall be brought by the county attorney upon the request of such complainant herein authorized.

Would the mother and child be parties in an action in which they are not the complainants but the complainant is a "person or agency substantially contributing to the support of the child"? Would the child be a party within the meaning of CR 35.01 when only the mother would be the complainant?

---

**2.** KRS 406.021(1) reads: "Paternity may be determined upon the complaint of the mother, child, person or agency substantially contributing to the support of the child. Such action shall be brought by the county attorney upon the request of such complainant herein authorized."

The Advisory Committee for the Federal Civil Rules of Procedure was sufficiently in doubt for it to propose the following words which were included in the 1970 revision of FRCP 35(a) and then made part of CR 35.01 by amendment in 1971: "or of a person in the custody or under the legal control of a party." The notes of the Advisory Committee explain:

> The amendment will settle beyond doubt that a parent or guardian suing to recover for injuries to a minor may be ordered to produce the minor for examination.

And finally, would the mother and child be parties if the county attorney exercised his prerogative under CR 17.01 and brought the action only in the name of the Commonwealth "without joining the party or parties for whose benefit it is prosecuted?"

■ These questions are raised not for the purpose of implying answers but rather to indicate that the General Assembly in 1964 had a reasonable basis for finding that "existing law" in the form of CR 35.01 was inadequate in itself to cover all of the blood-testing situations in paternity proceedings and that it therefore was desirable to supplement it in order to plug any possible gaps. In KRS 406.081 it insured to the defendant the same right to require blood tests of the mother and child as "existing law" (CR 35.01) granted to them through the County Attorney to require of him.

KRS 406.081 reads in part:

> The court, upon timely motion of the defendant, shall order the mother, child and alleged father to submit to blood tests.

The intent of the General Assembly to use KRS 406.081 only for the purpose of supplementing "existing law", and not for superseding it, is also evidenced by the modification made by it in the language proposed by the Commissioners on Uniform State Laws. The latter had recommended the following wording:

> The court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the [action] [proceeding] made at a time so as not to

delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests.

In limiting the motion to the defendant in KRS 406.081, the General Assembly reached back to the first draft of the Uniform Act on Paternity by the Commissioners on Uniform State Laws which had read:

> In any proceeding to determine the question of paternity, the court, on motion of the defendant, shall order the mother, her child and the defendant to submit to one or more blood grouping tests. . . .

By adopting such language from the first draft, the General Assembly succeeded in filling any gaps in the procedural law as to the right of the defendant to obtain blood tests of the mother and child as well as of himself, and at the same time, adhering to the general principle of preserving "existing law . . . wherever possible," had left room for CR 35.01 to continue to apply to situations not covered by KRS 406.081 and in a manner consistent therewith.

■ By being limited to providing a method for obtaining evidence, KRS 406.081, like CR 35.01, applies only to procedure and does not modify, or add to, substantive law as was recognized by *Beach v. Beach, supra,* and by the United States Supreme Court in *Sibbach v. Wilson & Co., Inc.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed.2d 479 (1941), wherein it held that FRCP 35 "really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law." One procedural rule or statute does not supersede another merely by providing an alternative means for obtaining the same type of evidence. For example, the discovery rules sometimes do so without one becoming subordinate to another. While overlapping in some instances, each of such rules has its particular function to perform just as CR 35.01 and KRS 406.081 have. The latter, in providing a method for obtaining blood tests by a defendant, does not purport to preclude mother, child, or other complainant from obtaining them of a defendant by using CR 35.01. To hold otherwise would subject KRS 406.081 to a charge of unlawful dis-

crimination which cannot be assumed the General Assembly intended. A procedural rule or statute is not immune from the 14th Amendment requirements of due process and equal protection of the laws. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1949). But KRS 406.081 does not offend the 14th Amendment. In summary, it does for the defendant what CR 35.01 formerly did, and still does, for the mother, child and other complainant. When harmonized by being construed together with CR 35.01, KRS 406.081 avoids discrimination and does not create it. Together they grant equal rights for the obtaining of blood test evidence to mother, child, and alleged father. KRS 406.081 is constitutional.

 Instead of being "inconsistent procedures" within the meaning of CR 1(2), CR 35.01 and KRS 406.081 are consistent in that each provides a method for obtaining blood tests from mother, child and alleged father. Blood tests of all three are essential for this evidence in a paternity case to have value. KRS 406.081 provides a method for doing so by directing that upon motion of the defendant the "court . . . shall order the mother, child and alleged father to submit to blood tests." The alleged father and the defendant ordinarily are one and the same person, being the one complained against. This same result can be obtained on behalf of the mother and child under CR 35.01 by having them voluntarily submit to blood tests or by ordering them to do so upon the court's motion[3] and by moving the court to order the defendant to submit to them. Since evidence of equal probative value cannot be obtained from another source and since in a paternity proceeding, as the court held in *Beach v. Beach, supra,* the characteristics of blood are a physical condition in controversy, the additional requirements of "good cause" and "physical condition . . . in controversy" found in CR 35.01 and not in KRS 406.081 do not make them "inconsistent procedures" within the meaning of CR 1(2). In these respects KRS 406.081 places no additional burden upon mother and child than was on them before such statute was passed. Good cause is shown when information of the same degree of reliability is not available from another source and it is useful in the preparation, trial, or disposition of the cause. Blood tests are the most reliable source for the truth in paternity cases. Chief Justice Burger stressed the unique value of HLA test evidence when he wrote in *Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981):

> The effectiveness of the seven systems attests the probative value of blood test evidence in paternity cases. The importance of that scientific evidence is heightened because "(t)here are seldom accurate or reliable eye witnesses since the sexual activities usually take place in intimate and private surroundings, and the self-serving testimony of a party is of questionable reliability."

Earlier, Kentucky courts had recognized the importance of blood-grouping tests in resolving problems of disputed parentage in *Simmons v. Simmons,* Ky., 479 S.W.2d 585 (1972) and *Tackett v. Tackett,* Ky., 508 S.W.2d 790 (1974). The necessity for the evidence and its unavailability from another source permit the showing of "good cause" to be routinely made and accordingly, an order under CR 35.01 is virtually as automatically obtainable as one under KRS 406.081. Since the frequency of use of CR 35.01 is not limited (CR 26.01), additional examinations may be secured under it as under KRS 406.091.

 Neither the statute nor the rule is locked into any particular type, method, or vintage of blood testing. Tests may be sought and used which were not in existence when CR 35.01 or KRS 406.081 was adopted. In some States use of blood tests affirmatively to establish a given male's paternity is explicitly barred by statute. See, e.g., Minn.Stats. § 885.23, discussed in *J.B. v. A.F. and B.F.,* 92 Wis.2d 696, 285 N.W.2d 880 (1979); *Winston v. Robinson,*

3. Under these circumstances a trial court has inherent authority to order such examinations.

*Scott v. Spanjer Bros., Inc.,* 298 F.2d 928 (2d Cir.1962).

Ark., 270 Ark. 996, 606 S.W.2d 757 (1980); *Cardenas v. Chavez,* 103 Mich.App. 646, 303 N.W.2d 3 (1981). Since in such States HLA tissue typing tests are admissible evidence only to show that the alleged father is not the father, the only party with a personal interest in obtaining such tests is the defendant. However, in Kentucky no such limitation upon the admissibility of blood test results exists. In a proper case KRS 406.111 in the discretion of the court permits such results also to be admitted to show the possibility of the alleged father's paternity. The HLA blood test has demonstrated this capability and hence is of value also to the plaintiff. The broad nature of this statute implies that blood-test evidence presented by qualified experts will be considered for admission even though representing a recently discovered technology provided it has gained general acceptance in the relevant scientific community within the general rule set forth in *Frye v. United States,* 293 F. 1013, 1014, 54 App.D.C. 46 (1923):

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidentiary force of the principle must be recognized, and while courts go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

At the time the Commonwealth moved pursuant to CR 35.01 for an order requiring the defendant, Kenneth Wade Perry, to submit to the HLA blood test, it had gained such general acceptance. The United States Supreme Court in *Little v. Streater,* supra, noted that the 1976 joint report of the American Bar Association and the American Medical Association "recommended the use of seven blood test 'systems'—ABO, Rh, MNS, Kell, Duffy, Kidd, and HLA—when investigating questions of paternity". In affirming the admissibility into evidence of the results of the HLA blood tissue test, the Court commented in *Catherine H. v. James S.,* N.Y., 112 Misc.2d 429, 447 N.Y.S.2d 109 (1982):

> The Court deems the authorized use by the Courts of these current blood testing procedures to be in recognition that the utilization of these sophisticated tests enhances the ability of a Court to more accurately adjudicate these matters.

After reviewing court decisions and the authorities as to HLA testing, the Court of Appeals of Kansas concluded in *Tice v. Richardson,* 7 Kan.App.2d 509, 644 P.2d 490 (1982):

> In sum, our review of the reported cases and recent literature convinces us that HLA tests to determine paternity are generally accepted in the scientific community as reliable.

■ Prejudicial error was committed by the district court when it denied the Commonwealth's motion under CR 35.01 for an order requiring the defendant, Kenneth Wade Perry, to submit to the HLA blood test. This Court affirms the decision of the Court of Appeals remanding the cause to the Jefferson District Court for a new trial and directs that it grant such motion of the Commonwealth if it be renewed and that, in such event, on its own motion it order HLA blood tests of the mother, Sheryl Kessinger, and of her child, Chad Kessinger, if they do not voluntarily submit to such tests.

■ We are confident, as was the Court of Appeals, that at this new trial "that counsel for appellant will not permit any witness to testify that Perry took a polygraph test." The statement of the facts on this issue are adopted from the opinion of the Court of Appeals:

> At the district court level, the case was tried to a six member jury. In reply to his own counsel's question, on the fourth day of trial, the appellant said that there was no doubt in his mind that he was the father of the child because "... I even went on my own and took a lie detector test." Objection to the remark was sustained, and each juror admonished, one by one, not to consider the statement

concerning the polygraph test. The court extracted a promise from each of them to disregard the remark and not to let it affect their deliberations. A mistrial was denied, the defendant was exonerated, and upon appeal, the circuit court determined that it was reversible error not to have granted the mistrial because not only did the six separate admonishments serve to compound the situation by over-emphasis, but also the plaintiff could not overcome the certainty in Perry's mind of non-paternity based upon a lie detector test.

The results of a polygraph or lie detector test are not admissible in evidence in Kentucky. *Stallings v. Com.* Ky., 556 S.W.2d 4 (1977). Thus, the statement volunteered by Perry was improper. Whether a mistrial should have been declared is a matter peculiarly within the sound discretion of the trial judge and his (or her) efforts to minimize or undo the prejudice. Here, the judge did all she could by fully admonishing each juror to disregard the answer and by securing a commitment from each one of them that he would do so. As Judge (now Mr. Justice) Blackmun observed in *Sanitary Milk Producers v. Bergjans Farm Dairy, In.,* 368 F.2d 679 (8th Cir.1966):

> Of course, curative instructions to a jury usually leave a reviewing court mildly uncomfortable for they never absolutely assure that the vice at which the instructions are directed is thereby wholly eliminated.

Here, the error occurred near the end of a four-day trial and little was lost in time, inconvenience, or expense by continuing the trial to the end. At the point where Perry made the improper answer, the trial judge had two methods available for curing the error, one by immediately declaring a mistrial and the other by granting a new trial should the verdict be, as it was, for the defendant. Of course, if the verdict had been for the plaintiff, the burden and expense of conducting more than three days of trial would have been salvaged. Abuse of a trial court's discretion is not to be presumed. Here, any abuse of discretion by the trial court is more appropriately based upon a failure to grant a new trial than for not declaring a mistrial.

The results reached by the Court of Appeals are affirmed.

STEPHENS, C.J., AKER and VANCE, JJ., and MARLIN M. VOLZ, UHEL O. BARRICKMAN and A.J. JOLLY, Special Justices, concur.

STEPHENSON, J., dissents, and herewith files a separate dissenting opinion.

STEPHENSON, Justice, dissenting.

It is with some trepidation that I disagree with such a scholarly opinion. However, I am firmly convinced that the major premise of the majority opinion is faulty. I would feel more comfortable with an opinion based on inherent power of the courts, although I would have serious reservations about that.

First I find it incredible that there would be an "equal protection" or "discrimination against female" argument. Of course, KRS 406.081 is constitutional. By its terms the statute pertains to the negative type blood test, which was the accepted blood test at the time of adoption of the Uniform Paternity Act. This blood test could conclusively establish that the individual was not the father, otherwise the result would be inconclusive with a possibility that the individual could be the father. Obviously the mother would have no interest in a blood test that had as its only value a showing that the man could not be the father. Here, of course, the controversy is over a newer, more sophisticated blood test, that does more than show a negative result, but can show a positive result. The equal protection argument is ridiculous. The simple answer is that the statute authorized the negative test by its explicit terms, and there is no statutory mandate for the more sophisticated test.

The holding that KRS 406.081 and CR 35.01, which the majority finds saves the constitutionality of KRS 406.081, are not inconsistent really baffles me!

In reading CR 35.01, I cannot find by inference or otherwise that the rule authorizes a court to order this newer blood test. The U.S. Circuit Court of Appeals for the District of Columbia opinion in *Beach* is cited for authority that "the characteristics of one's blood ... are part of one's *physical condition*," in order to bring this test within CR 35.01 (the same as FRCP 35(a) construed by the Circuit Court of Appeals). This is pure sophistry. The opinion demonstrates how an appellate court can decide what it wishes to do and then fashion a reason, no matter how farfetched.

There simply is no authority in the Rules or the Statutes to authorize a court to order this blood test.

The majority opinion treats this subject as a matter of discovery. Even looking at this proposition as discovery, I do not find any literature or cases suggesting the right to order discovery as an inherent right of the court.

A further difficulty is presented by the earlier cases that hold although the action is "civil in nature, it has a criminal aspect." *White v. Com. ex rel. Feck*, Ky., 299 S.W.2d 618 (1957). *Little v. Streater* cited in the majority opinion also supports the proposition that although the proceedings may be characterized as civil, such proceedings have quasi-criminal overtones. Thus I believe there are many serious obstacles to the concept of inherent power of a court to order the blood test.

Accordingly, I dissent.